**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Carl NORTHRIP, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 14, 2008.

Filed March 10, 2008.

Robert M. Buttner, Scranton, for appellant.

* Former Justice specially assigned to Superior Court.

Raymond J. Tonkin, Asst. Dist. Atty., for Com., appellee.

BEFORE: BENDER, ALLEN, and FITZGERALD,* JJ.

OPINION BY FITZGERALD, J.:

¶ 1 Appellant, Carl Northrip, appeals from the judgment of sentence entered in the Pike County Court of Common Pleas following his convictions of sexual crimes involving his minor daughter, S.F. We hold that the trial court erred when it prevented Appellant's wife from testifying to S.F.'s motive to fabricate the allegations based on the Pennsylvania Rape Shield Statute, 18 Pa.C.S. § 3104(a), but that this error was harmless in light of Appellant's telephone conversation with S.F. However, we hold that the trial court erred in treating Appellant's conviction of New York Penal Law section 150.10, arson in the third degree, as a crime of violence in Pennsylvania under 42 Pa.C.S. § 9714. Accordingly, we affirm the convictions, but vacate the judgment of sentence and remand for resentencing.

¶ 2 Appellant and S.F.'s mother were divorced during the relevant time period, with S.F.'s mother having primary custody of S.F. When S.F. was twelve years old, Appellant married Mary Northrip, who had a teenage son, K.R., from a previous relationship. Soon after Appellant and Mary wed, Appellant began visiting S.F. for dinner, beginning in February of 2003 as part of a custody arrangement. In March of 2003, S.F. began overnight visits at Appellant's home on a semi-regular basis.

¶ 3 S.F. alleged that Appellant began to touch her inappropriately in May of 2003,

including one failed and one successful attempt at sexual intercourse. S.F. stayed at Appellant's home again in August of 2003 for five days, with no alleged incident. However, S.F. alleged that on Halloween night that year, Appellant touched her inappropriately. S.F. continued to visit Appellant and Mary, including a weeklong stay in December of 2003.

¶ 4 S.F.'s next visit was not until March 2004. In late April of 2004, S.F. stayed at Appellant's home in order to attend K.R.'s birthday party. S.F. alleged that Appellant called her into his bedroom, where they had sexual intercourse. S.F. visited Appellant again in May of 2004, then for five days in August, once in September, once in November, and several times in December. S.F. alleged that she and Appellant had sexual intercourse during the November visit, and she performed oral sex on him during a mid-December visit.

¶ 5 Mary Northrip testified that she was at the house for nearly all of S.F.'s visits and rarely left her and Appellant alone. She contradicted S.F.'s testimony on several matters, including dates on which S.F. claimed to have visited their home and when S.F. could have been alone with Appellant. K.R. also testified for Appellant, asserting that S.F. could not have been with Appellant on Halloween because K.R. was alone with Appellant, or after the birthday party because K.R. was alone with S.F.

¶ 6 S.F. testified that, at first, she told only her friends that she was having sex, and that at the time she identified her sexual partner as "James." She eventually told her friends that her sexual partner was actually her father, but when confronted by a friend's mother, she denied those claims. She did not inform anyone else until January 2005, when she told her boyfriend. State police then arranged for a taped phone call, during which S.F. asked Appellant on numerous occasions if he might have impregnated her. Appellant's responses were mostly non-committal, though he rejected the possibility that she was pregnant because "nobody has [ejaculated] inside of [S.F.]" and "there was no release." Commonwealth's Exhibit 1, Transcript, 1/14/05, at 9, 15. Soon afterward, Appellant was arrested.

¶ 7 Prior to trial, Appellant filed a motion to introduce evidence of sexual acts between S.F. and K.R., arguing that it would prove a bias or motive to fabricate by S.F., and that it would explain Appellant's state of mind during the phone call. At a pre-trial hearing, Mary Northrip testified that she caught K.R. and S.F. kissing and fondling each other on a few occasions. She claimed that S.F. pleaded with her and Appellant not to tell S.F.'s mother, leading Mary to believe that S.F. feared her mother's reaction. K.R. was not available to testify, but in a verification filed with Appellant's motion, K.R. stated that he and S.F. had oral sex, but not sexual intercourse. At the hearing, Appellant testified that he was aware of K.R. and S.F.'s sexual relationship, which would explain his state of mind when answering S.F.'s questions vaguely over the phone. Finally, the motion also sought the admission of S.F.'s diary because it contained no entry indicating that Appellant assaulted her, and of romance books S.F. was reading because they would provide a basis upon which S.F. may have fabricated her allegations.

¶ 8 The trial court denied Appellant's motion. A jury convicted Appellant of two counts of involuntary deviate sexual intercourse, three counts of statutory sexual assault, four counts of incest, and six counts of corruption of minors. The Commonwealth notified Appellant of its intent to seek a mandatory minimum sentence based on a prior conviction for arson in

New York, arguing that it was a crime of violence. The trial court applied the mandatory minimum and sentenced him to an aggregate term of thirty to sixty years' imprisonment. Post-sentence motions were filed and denied. This appeal followed.[1]

¶ 9 Appellant raises four evidentiary claims and one claim challenging the legality of his sentence. Regarding his evidentiary claims, Appellant first argues that Mary Northrip should have been permitted to testify about her observations of sexual activity between S.F. and K.R. because it would have been relevant to S.F.'s motive to fabricate the charges against Appellant. Appellant then claims that Mary's and K.R.'s testimony would have been relevant to prove his state of mind during his phone conversation with S.F. He also contends that S.F.'s diaries, journals, and romance books were relevant to S.F.'s credibility. We address these evidentiary claims *seriatim.*

> The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Further, an erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error is harmless.

>> An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is overwhelming, so that by comparison the error is insignificant.

> *Commonwealth v. Isaac Mitchell,* [576 Pa. 258] 839 A.2d 202, 214–15 ( [Pa.] 2003). The Commonwealth bears the burden of demonstrating harmless error. *See Commonwealth v. Mayhue,* [536 Pa. 271] 639 A.2d 421, 433 ( [Pa.] 1994).

*Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 452–53 (2006).

¶ 10 We first address Appellant's claim that Mary Northrip should have been permitted to testify about S.F. and K.R.'s sexual activity. This claim implicates the Pennsylvania Rape Shield Statute, which provides:

> § 3104. **Evidence of victim's sexual conduct**

> (a) **General rule.**—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S. § 3104(a).[2] This Court has recognized that an exception to Section 3104

---

1. We note that Appellant filed his notice of appeal on February 12, 2007, though the trial court did not deny his post-sentence motion until February 21, 2007. *See* Trial Ct. Docket at 29. Nonetheless, we consider his notice of appeal timely filed. *See* Pa.R.A.P. 905(a) ("notice of appeal filed after the announcement of a determination but before the entry

of an appealable order shall be treated as filed after such entry and on the day thereof").

2. Section 3104(b) prescribes the proper procedure for a defendant who proposes to offer evidence of the alleged victim's past sexual conduct. These procedures were properly followed by the trial court and Appellant.

exists when the evidence tends "to directly exculpate the accused by showing that the alleged victim is biased and thus has a motive to lie, fabricate, or seek retribution" because such evidence affects the defendant's constitutional right to confront and cross-examine witnesses. *Commonwealth v. Fernsler*, 715 A.2d 435, 439 (Pa.Super.1998) (quoting *Commonwealth v. Guy*, 454 Pa.Super. 582, 686 A.2d 397, 400 (1996)). The trial court must then examine the evidence to determine whether the probative value outweighs its prejudicial effect and whether there is an alternative way to prove the motive to fabricate. *Commonwealth v. Black*, 337 Pa.Super. 548, 487 A.2d 396, 401 (1985). Instantly, the trial court concluded that Appellant failed to prove that his knowledge of S.F.'s sexual activity with K.R. gave her motivation to fabricate the allegations. We disagree.

¶ 11 At the pre-trial hearing, Mary Northrip testified that, after observing S.F.'s behavior with K.R., she and Appellant informed S.F. that they were considering telling S.F.'s mother about the incidents. N.T. Hearing, 5/5/06, 15. Mary stated that S.F.'s response was, "[I]f I tried to talk to her mother, 'I [ (Mary) ] know her Mom and I would be sorry.'" *Id.* Mary added that S.F. was "nervous and forceful" when informed of the possibility that Mary and Appellant would tell S.F.'s mother about the relationship because "she is not allowed to have boyfriends and she is not allowed to do anything." *Id.* at 19. Mary further noted that, shortly before Christmas, she caught S.F. and K.R. together again and warned S.F., "After the holidays, [S.F.], we will deal with this. Your Dad and I are going to talk and we are going to have a conversation with your mother." *Id.* at 21. According to Mary, over the holidays S.F. asked her, "Mary are you going to really talk to my mom," to which Mary responded, "[W]e are not going to deal with this issue right now. It is Christmas. It is the holidays. We are going to deal with this later." *Id.* Shortly before New Year's Day, Mary learned from the mother of K.R.'s best friend that S.F. may have performed oral sex on K.R. *Id.* at 23. Finally, Mary testified that shortly after New Year's Day, S.F. called and asked, "Are you guys still planning on talking to Mom," to which Mary responded, "I believe your Dad already arranged a meeting with [her]. I'm not sure." *Id.* at 22. S.F.'s response, according to Mary, was, "You know Mom, you will be sorry." *Id.* Approximately one week later, S.F.'s aforementioned phone call took place, and Appellant was arrested.

¶ 12 We find this evidence relevant to establish a potential motive by S.F. to fabricate her allegations against Appellant. Mary Northrip's testimony, if believed, created a timeline in which S.F. may have become gradually more concerned about the possibility that Appellant would inform S.F.'s overprotective mother of S.F.'s behavior with K.R. Although the Commonwealth argues that "there is no evidence to indicate that [S.F.] knew that Mary Northrip had communicated this information to Appellant," or "that Appellant communicated anything to [S.F.] about these actions," Commonwealth's Brief at 8, Mary's testimony clearly indicates that S.F. inquired as to whether Mary **and** Appellant would talk to S.F.'s mother. Moreover, when considering S.F.'s motive to fabricate, it is irrelevant whether Mary actually communicated with Appellant or whether Appellant actually knew of their behavior. Instead, the relevant consideration is whether S.F. feared that Appellant knew about her and K.R., and whether she felt compelled to fabricate allegations about Appellant as a reactive measure. The trial court did not offer any opinion as to Mary's credibility and made only a boiler-

plate finding that Appellant failed to prove S.F. "was fearful to a level sufficient to motivate her to fabricate accusations of repeated sexual abuse by her father." Trial Ct. Op. at 6.

¶ 13 Without more, we are constrained to find that the trial court's conclusion contradicts Mary Northrip's testimony. Further, the prejudicial value would not outweigh its probative value because Mary's allegations, about S.F. and K.R. specifically, do not focus on S.F.'s reputation for chastity in the way Section 3104 was designed to protect. *See Commonwealth v. Johnson*, 536 Pa. 153, 638 A.2d 940, 942 (1994) ("The purpose of the Rape Shield Law is to prevent a sexual assault trial from denigrating into an attack upon the victim's reputation for chastity."). Finding no alternative means by which Appellant could present evidence to establish S.F.'s motive to fabricate, we conclude that the trial court should have permitted Mary Northrip to testify about S.F.'s motive to fabricate the allegations against Appellant. *See Black, supra.*

¶ 14 Although we find that Mary's proffered testimony does not violate the Rape Shield Act, remand is not appropriate unless we determine that there is a reasonable possibility the precluded evidence would have resulted in a different verdict. *See Mitchell, supra.* Accordingly, we will proceed to address Appellant's remaining evidentiary claims, then examine all the evidence in the context of the trial to determine if the verdict was affected by the absence of that evidence.

¶ 15 Appellant's second claim is that K.R. should have been permitted to testify that he told Appellant about his behavior with S.F. and verified they did not have sexual intercourse, thus establishing Appellant's state of mind when he told S.F. that "nobody [ejaculated] in you." The Commonwealth contends that this claim is waived for failure to raise it in his Pa.R.A.P.1925(b) statement. We are constrained to agree with the Commonwealth.

¶ 16 "Any issues not raised in a Pa.R.A.P.1925(b) statement will be deemed waived." *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 309 (1998). *See also Commonwealth v. Castillo*, 585 Pa. 395, 888 A.2d 775, 780 (2005) (reaffirming "bright-line rule first set forth in *Lord*"). Instantly, the relevant part of Appellant's 1925(b) statement provides:

5. Did the Trial Court err as a matter of law and/or abuse its discretion in its application of the Rape Shield Law (18 Pa.C.S.A. § 3104) when it excluded that evidence of complainant's past sexual conduct or statements the claimant made to others concerning her knowledge and/or conduct, including, but not limited to, the testimony of Mary Northrip and particularly [K.R.] to the effect that the complaint told him that she was pregnant because of him, where such evidence established bias, fabrication, motive to lie and source of knowledge, and impermissibly deprived [Appellant] of proffering a fair defense in violation of the Confrontation Clause of the United States Constitution, Amendment VI, and Article 1 § 9 of the Pennsylvania Constitution?

Appellant's Rule 1925(b) Statement at 2. Nowhere in that paragraph or in the entire statement does Appellant allege that the trial court erred in denying his state-of-mind motion. Although Appellant cites K.R.'s testimony and a "source of knowledge," he fails to suggest that these elements were relevant to his state of mind when answering S.F.'s phone call. Accordingly, this claim is waived. *See Castillo, supra; Lord, supra.*

¶ 17 Appellant's next claim is that the trial court should have permitted him

to introduce S.F.'s diary and "Body Book Journal" as a challenge to S.F.'s credibility. He argues that the absence of any notation in either the diary or journal of the sexual assaults was relevant to S.F.'s credibility. He avers that entries contained within the diary portrayed Appellant in a positive light, and were thus admissible as prior inconsistent statements. We disagree.

¶ 18 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "[M]ere dissimilarities or omissions in prior statements do not suffice as impeachable evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witnesss' [sic] testimony to be admissible as prior inconsistent statements." *Commonwealth v. Johnson,* 758 A.2d 166, 170 (Pa.Super.2000) (quoting *Commonwealth v. Cruz–Centeno,* 447 Pa.Super. 98, 668 A.2d 536, 544 (1995)). In particular, we are reluctant to place any great weight on omissions from a teenager's diary because the teenager may write entries with the perspective and fear that a parent would discover and read these entries. Aside from one entry in which S.F. states, "I have four very snoopy parents," Appellant's Brief at 37, Appellant cites no contextual evidence from the books that would tend to prove that S.F. would have noted a sexual assault by her father, nor do we find any upon our review of the diary. The "snoopy parents" comment is not one for which S.F. would fear the possibility of significant punishment if discovered by her parents, whereas an entry that she and her father had sexual relations would have severe ramifications for many parties. We note further that the diary and journal contain no reference to sexual activity between S.F. and K.R., despite Appellant's insistence that they had a sexual relationship. Because the evidence contained in these books had no probative value, we agree with the trial court that the evidence was irrelevant and did not qualify as impeachment evidence. *See Johnson, supra.*

¶ 19 Appellant's final evidentiary claim is that he should have been permitted to question S.F. about romance novels she was reading before accusing Appellant of sexually assaulting her. According to Appellant, it was necessary to read certain passages from the novels, which involved a sexual relationship between a father and daughter, in order to link S.F.'s allegations with her admissions that she was a creative writer and had a propensity to lie to her friends. He concludes that, had the jury heard these passages, it would see the foundation upon which S.F. fabricated her allegations against Appellant. We disagree.

¶ 20 The trial court noted that Appellant presented two specific passages he wished to introduce: "It was her moan that changed his mind, the dark throaty sound made him move closer," and, "Bring her tight against his body, so they touch from lips to thighs." Appellant's Brief at 40–41 (quoting N.T. Trial, 5/8/06, 113–14). Appellant cites no other passages he believed were relevant to his defense. Crucially, Appellant makes no attempt in his appellate brief to connect these passages with specific allegations made by S.F. The trial court permitted Appellant to introduce the titles of the novels and to examine S.F. about whether she had read those adult novels, which established a basis upon which Appellant could argue that S.F. derived her allegations from these novels. Because the specific statements cited by Appellant provided no further insight into S.F.'s allegations, we agree with the trial court that these passages were irrelevant.

¶ 21 Therefore, we must determine whether the exclusion of Mary Northrip's testimony requires a new trial. We find it does not. Although Mary's testimony would have provided a basis upon which the jury could have contemplated whether S.F. fabricated her allegations, we cannot conclude that the jury would have accorded any weight to her testimony after hearing a recording of the phone call from S.F. to Appellant, in which S.F. accused Appellant of impregnating her. Appellant contends that his vague responses to S.F.'s questions and accusations do not constitute proof of his guilt. However, we find the following passages particularly incriminating:

[S.F.]: Because it's been two months since I've had my period and I'm afraid I'm pregnant.

[Appellant]: From whom?

[S.F.]: Who do you think, you.

[Appellant]: Huh.

* * *

[Appellant]:Okay, and number two you know the reason has [ejaculated] inside of you [S.F.]

[S.F.], Dad, what if something happened what if you slipped?

[Appellant]: [S.F.],

[S.F.]: Don't call me that, don't get pissed off at me.

[Appellant]: I'm not.

[S.F.]: I am scared, that's why I called you.

[Appellant]: That's why I am trying to talk to you about this reasonably and like an adult, and you need to listen to me. Okay, you seem to think I don't have a brain in my head when I'm talking to you about this. I know what I'm saying when I'm talking to you. Okay, now tell me why you

think you are– other than you feel funny.

[S.F.]: I just, I haven't gotten my period for two months, that never ever happens and I have no more stress than I always have. Okay?

* * *

[S.F.]: No, I want you to tell me if there is any possible way that you got me pregnant.

[Appellant]: No.

[S.F.]: How do you know that?

[Appellant]: [S.F.]

[S.F.]: What?

[Appellant]: The only thing I can do is next time you come is you can take a test.

[S.F.]: But you are not answering my question.

[Appellant]: I answered your question.

[S.F.]: No you didn't there is nobody else okay, there is nobody else who could have got me pregnant, are you sure that there is no possible way in hell that you got me pregnant.

[Appellant]: Positive.

[S.F.]: How?

[Appellant]: [S.F.]

[S.F.]: How, tell me how.

[Appellant]: Here I'm standing right here next to Mary, you want to talk to her?

* * *

[Appellant]: Okay, and you know why I don't think so[?] Because there was no release.

[S.F.]: From you.

[Appellant]: Right.

* * *

[S.F.]: Okay I'm trying to tell you that I'm scared that I'm pregnant and that

I don't want to have a baby that is related to me.

[Appellant]: Um [S.F.]–

[S.F.]: Hmm?

[Appellant]: If you have any baby at all it's related to you.

[S.F.]: No, I mean related to me as a sibling!

[Appellant]: Then if you don't want it then we will help you okay? Do you understand that, do you understand that?

* * *

[Appellant]: You're telling me what?

[S.F.]: I'm telling you that I think I'm pregnant with your baby.

[Appellant]: I know what you are saying.

Commonwealth's Exhibit 1, Transcript, 1/14/05, at 2–3, 9–10, 10–11, 15, 16–17, 17. In particular, when Appellant mentioned that "there was no release," S.F. responded, "From you," to which Appellant responded, "Right."[3] *Id.* at 15. S.F. continuously insisted that Appellant impregnated her, which Appellant appeared to accept save for his assertion that "nobody has [ejaculated] inside of you." We conclude that the phone conversation overwhelmingly minimizes any effect Mary Northrip's testimony would have had on the jury, and therefore consider the preclusion of her testimony to be harmless error. *See Mitchell, supra.*

■ ¶ 22 Appellant's final claim is that the trial court erred in considering his 1990 conviction of arson in New York, under Penal Law section 150.10, as a crime of violence under 42 Pa.C.S. § 9714. The trial court found that the New York statute was substantially identical to Pennsylvania Crimes Code Section 3301(a), which Appellant concedes is a crime of violence and would subject him to mandatory sentencing enhancements. Appellant, however, argues that the New York statute more closely resembles Section 3301(c), which is not a crime of violence.[4] He contends that a reading of all the arson and sentencing statutes in the New York Penal Law reveals that New York does not consider his previous conviction to be a violent felony, and therefore the trial court erred in classifying it as a crime of violence. We agree.

■ ¶ 23 Initially, we observe that Appellant's claim implicates the legality of his sentence. *See Commonwealth v. Shaw,* 560 Pa. 296, 744 A.2d 739, 742 (2000) (noting that a claim alleging the trial court erred in calculating prior convictions, for purposes of determining whether a mandatory minimum sentence applies, addresses the legality of the sentence).

The test to determine whether an out-of-state offense is an equivalent of a Pennsylvania offense requires the sentencing court to compare the elements of the crimes, the conduct prohibited by the offenses, and the underlying public policy behind the two criminal statutes. If the sentencing court determines that the prior offense is equivalent to a violent crime enumerated under a Pennsylvania statute, the defendant will be subject to the mandatory minimum sentence of total confinement. We note that the of-

---

**3.** Even if we were to consider Appellant's waived argument that his knowledge of K.R.'s and S.F.'s sexual relationship affected his state of mind during the conversation, this exchange weighs substantially against that defense.

**4.** At sentencing, Appellant argued that his conviction was most similar to Section 3301(d). In his post-sentence motion, he abandoned that claim, choosing instead to argue that his conviction was most similar to Section 3301(c).

fenses do not identically have to mirror each other but must be substantially equivalent to invoke operation of 42 Pa. C.S. § 9714.

*Commonwealth v. Ward,* 856 A.2d 1273, 1277 (Pa.Super.2004).

[T]he court may want to discern whether the crime is *malum in se* or *malum prohibitum,* or whether the crime is inchoate or specific. If it is a specific crime, the court may look to the subject matter sought to be protected by the statute, *e.g.* protection of the person or protection of property. It will also be necessary to examine the definition of the conduct or activity proscribed. In doing so, the court should identify the requisite elements of the crime-the *actus reus* and *mens rea*-which form the basis of liability.

*Commonwealth v. Bolden,* 367 Pa.Super. 333, 532 A.2d 1172, 1176 (1987).

¶ 24 Appellant was convicted of arson in New York in 1990. The relevant statute provided:

### § 150.10 Arson in the third degree

1. A person is guilty of arson in the third degree when he intentionally damages a building or motor vehicle by starting a fire or causing an explosion.

2. In any prosecution under this section, it is an affirmative defense that (a) no person other than the defendant had a possessory or proprietary interest in the building or motor vehicle, or if other persons had such interests, all of them consented to the defendant's conduct, and (b) the defendant's sole intent was to destroy or damage the building or motor vehicle for a lawful and proper purpose, and (c) the defendant had no reasonable ground to believe that his conduct might endanger the life or safety of another person or damage another building or motor vehicle.

N.Y. Penal Law § 150.10 (McKinney 1988). In order to compare the relevant statutes properly, we also consider New York's provisions for second- and fourth-degree arson:

### § 150.05 Arson in the fourth degree

1. A person is guilty of arson in the fourth degree when he recklessly damages a building or motor vehicle by intentionally starting a fire or causing an explosion.

2. In any prosecution under this section, it is an affirmative defense that no person other than the defendant had a possessory or proprietary interest in the building or motor vehicle.

\* \* \*

### § 150.15 Arson in the second degree

A person is guilty of arson in the second degree when he intentionally damages a building or motor vehicle by starting a fire, and when (a) another person who is not a participant in the crime is present in such building or motor vehicle at the time, and (b) the defendant knows that fact or the circumstances are such as to render the presence of such a person therein a reasonable possibility.

N.Y. Penal Law §§ 150.05, 150.15.

¶ 25 The Pennsylvania statutes at issue are subsections (a) and (c) of Pennsylvania Crimes Code Section 3301 (Pennsylvania section 3301), which provide:

**(a) Arsons endangering persons.—**

(a) A person commits a felony of the first degree if he intentionally starts a fire or causes an explosion, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, whether on his own property or on that of another, and if:

(i) he thereby recklessly places another person in danger of death or bodily injury, including but not limited to a firefighter, police officer or other

person actively engaged in fighting the fire; or

(ii) he commits the act with the purpose of destroying or damaging an inhabited building or occupied structure of another.

\* \* \*

**(c) Arson endangering property.**—A person commits a felony of the second degree if he intentionally starts a fire or causes an explosion, whether on his own property or that of another, or if he aids, counsels, pays or agrees to pay another to cause a fire or explosion, and if:

(1) he commits the act with intent of destroying or damaging a building or unoccupied structure of another;

(2) he thereby recklessly places an inhabited building or occupied structure of another in danger of damage or destruction; or

(3) he commits the act with intent of destroying or damaging any property, whether his own or of another, to collect insurance for such loss.

18 Pa.C.S. § 3301(a), (c).

¶ 26 Instantly, as all parties acknowledge, the language of New York Penal Law § 150.10 (N.Y. section 150.10) does not precisely mirror that of 18 Pa.C.S. § 3301(a) or (c). Whereas the Pennsylvania statute clearly labels its subsections, "Arson endangering persons" or "Arson endangering properties," the New York statutes make no such distinction. *Compare* 18 Pa.C.S. § 3301(a), (c), *with* N.Y. Penal Law §§ 150.05, 150.10, 150.15. Further, Pennsylvania's most severe arson provision includes reckless endangerment of firefighters or other persons, while New York's statute for second-degree arson fails to require that specific finding. Instead, N.Y. § 150.10 lists endangerment of another person as an element of an affirmative defense. *See* N.Y. Penal Law § 150.10.

¶ 27 The remaining elements of the *Ward* test also fail to reveal an obvious answer on their face. Subsection 150.10(1) targets intentional inflammation of any building or motor vehicle. Subsection 150.10(2), however, provides for an affirmative defense if the defendant can prove each of three elements, one of which is reasonable endangerment of other persons. Thus, while subsection 150.10(1) focuses on protection of property, subsection 150.10(2) adds an element of protection of persons.

¶ 28 Nonetheless, our close reading of the relevant statutes convinces us that the conduct prohibited by, and the underlying public policy behind, each offense differs, primarily because New York's "Arson in the third degree" is significantly broader than Pennsylvania's "Arson endangering persons." While we agree with the Commonwealth that some persons convicted of New York section 150.10 would also be guilty of violating Pennsylvania section 3301(a), the critical inquiry is whether any factual scenario sufficient for conviction of New York section 150.10 would correspondingly have been insufficient for conviction under Pennsylvania section 3301(a). We find that such scenarios exist. For example, a person might intentionally set fire to an abandoned, isolated, and remote building, of which another person had a possessory or proprietary interest. If he reasonably believes that firefighters would not respond and place themselves in danger because of the building's remote location, he would nonetheless be subject to prosecution under New York section 150.10 because he would fail to meet the first requirement of pleading an affirmative defense under that section. *See* N.Y. Penal Law § 150.10(2) (requiring a defendant to prove, *inter alia*, that "no person other than the defendant had a possessory or proprietary interest in the building" or that all interested persons "consented to the defendant's conduct" in order to have

affirmative defense). However, he would not be subject to prosecution under Pennsylvania section 3301(a) because he would not have placed another person in danger of bodily injury, pursuant to subsection (a)(1)(i), or destroyed an inhabited building or occupied structure of another, pursuant to subsection (a)(1)(ii). *See* 18 Pa.C.S. § 3301(a)(1). Instead, the highest-graded arson offense of which he could be convicted is Pennsylvania section 3301(c), which is not a crime of violence in Pennsylvania. *See* 18 Pa.C.S. § 3301(c)(1) (proscribing act of intentionally starting a fire with the intent of destroying or damaging a building or unoccupied structure of another).

¶ 29 Such a factual scenario indicates that N.Y. section 150.10 emphasizes protection of property, whereas Pennsylvania section 3301(a) is clearly a statute protecting the person. Although N.Y. section 150.10 adds an element of protection to the person, it is only one of three elements needed for an affirmative defense. Instead, N.Y. section 150.15, arson in the second degree, emphatically shifts the focus from protection of the property to protection of the person by quoting, almost verbatim, N.Y. section 150.10(1), then adding as **required** elements endangerment of persons, rather than as one of several elements for an affirmative defense.[5] *Compare* N.Y. Penal Law § 150.15, *with* N.Y.

Penal Law § 150.10. As a result, we consider the public policy behind N.Y. section 150.10 to be the prevention of arson of property belonging to others. We conclude that Appellant's 1990 conviction of N.Y. section 150.10 must be considered a prior conviction under 18 Pa.C.S. § 3301(c), a crime against property, rather than 18 Pa.C.S. § 3301(a), a crime against persons. Accordingly, the trial court erred in classifying his 1990 New York conviction as a crime of violence and applying the corresponding mandatory sentencing enhancement for second offenses.[6]

¶ 30 We therefore hold that the trial court erred when it precluded Mary Northrip from testifying as to S.F.'s potential motive to fabricate the allegations against Appellant. However, because this error was harmless, we affirm Appellant's convictions. We nonetheless vacate the judgment of sentence and remand for resentencing in accordance with the principles set forth herein.

¶ 31 Convictions affirmed. Judgment of sentence vacated. Case remanded with instructions. Jurisdiction relinquished.

¶ 32 BENDER, J. concurs in the result.

---

5. N.Y. Section 150.15 omits "or causing an explosion," a distinction that is irrelevant to the instant issue.

6. Appellant also observes that New York does not specifically classify third-degree arson as a crime of violence. *See* N.Y. Penal Law § 70.02(1)(a) (McKinney 1987) (specifying that section 150.15 is a Class B violent felony, but omitting 150.10 in the list of violent felony offenses). Rather, N.Y. section 60.05 directs that Class B and C violent felons be sentenced under N.Y. section 70.02, while persons convicted of "arson in the third degree as defined in section 150.10" are Class C felons who "must be sentenced to imprisonment in accordance with section 70.00." *See* N.Y. Penal

Law § 60.05 (McKinney 1987). This argument is persuasive, though not conclusive. The primary inquiry is whether N.Y. section 150.10 is equivalent to Pennsylvania section 3301(a) and therefore a Pennsylvania crime of violence. *See Ward, supra.* However, this argument is relevant to the focus of N.Y. section 150.10, and justifies our finding that the New York legislature, in declining to mandate section 150.10 as a crime of violence, intended for that section to protect against arson of property while intending for section 150.15, which it specifically classified as a violent felony offense, to act as protection of the person.