J.A19033/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| STEVEN GREGORY EAKIN, | : | |
| | : | |
| Appellant | : | No. 493 WDA 2012 |

Appeal from the Judgment of Sentence February 7, 2012
In the Court of Common Pleas of Venango County
Criminal Division No(s).: CP-61-CR-0000115-2011

BEFORE: BENDER, P.J.E., OLSON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MARCH 11, 2015**

Appellant, Steven Gregory Eakin, appeals from the judgment of sentence entered in the Venango County Court of Common Pleas following a five-day jury trial and his convictions for theft by unlawful taking,[1] theft by deception,[2] theft by failure to make required disposition of funds received,[3] and misapplication of entrusted property.[4]  On appeal, Appellant challenges the introduction of the circumstances of his firing by a prior employer,

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 3921(a).

[2] 18 Pa.C.S. § 3922(a)(1).

[3] 18 Pa.C.S. § 3927(a).

[4] 18 Pa.C.S. § 4113.

permitting the jury, during its deliberation, to review exhibits containing alleged hearsay, and the introduction of forensic computer evidence to impeach his testimony. We affirm.

We adopt the facts and procedural history set forth in the trial court's opinion. *See* Trial Ct. Op., 6/25/13, at 1-4, 8-16, 18-22. After three hours of deliberation, a jury convicted Appellant on December 16, 2011, and on February 7, 2012, the court sentenced Appellant to six to twenty-four months' imprisonment. Appellant timely filed, and the court denied, his post-sentence motion. Appellant timely appealed and filed a Pa.R.A.P. 1925(b) statement that same day.

Appellant raises the following issues on appeal:

> Whether the trial court committed an error of law and abused its discretion by allowing the Commonwealth, on cross-examination of [Appellant], to introduce unrelated and uncharged evidence of [Appellant's] purported prior bad act or dishonest conduct surrounding [Appellant's] termination by a former employer.
>
> Whether the trial court committed an error of law and abused its discretion to [sic] permitting the jury to receive and consider in its deliberations Commonwealth Exhibits 14, 25, 27, 28, 29 and 31, all of which contained hearsay and/or witness statements which permitted the jury to place undue emphasis on such hearsay statements as opposed to live witness testimony subject to cross-examination.
>
> Whether the trial court committed an error of law and abused its discretion in allowing the Commonwealth, on cross-examination of [Appellant], to introduce over [Appellant's] objection, forensic computer hearsay evidence outside of the trial record in an attempt to impeach [Appellant's] testimony.

Appellant's Brief at 8.

For his first issue, Appellant argues that the court erred by permitting the Commonwealth to cross-examine him about his termination by a former employer. He frames the cross-examination as an impermissible introduction of prior bad acts or dishonest conduct. Appellant opines he was prejudiced and his conviction should be reversed. Appellant, we hold, is not entitled to relief.

By way of background, we reproduce the relevant testimony as follows:

> [Appellant's counsel]. Steve, tell us a little bit about your employment background. You're a high school graduate. Can you tell us when you graduated from high school and where?
>
> [Appellant]. 1975 graduate from Cranberry High School.
>
> Q. Okay, what'd you do after high school?
>
> A. I was a notary public for four years, I guess, and, um, I got involved in a local trucking business about 1979. I worked there until I think about January of 1984. After that I was elected president of a coating's company, which had its plant and offices in Clarion County and I operated as president and board member of that company, I believe until about 2003. I'm sorry—yeah, 87 until about 2002 or 2003, somewhere in that range. Um, in the interim—that's not accurate. 1987 until about 1993, in that range, because in March of 1993, I didn't try to lose 10 years there, but, in March of 1993 I went to work in a local law office as a paralegal.
>
> Q. Okay, how long did you work there?
>
> A. For 10 years, until 2003.

Q. Alright, have you held any other positions in the community; serve the community in any other respect?

A. Yeah, um, in 1997, while I worked as a paralegal I took a leave of absence from the law office and I was manager to Judge Lobaugh's election campaign; it's the first time he ran for office. I think he was a district judge then; ran for Court of Common Pleas and was elected in 97. In January of 1998, um, I was—I ended up chairing the, I guess it was called the Judicial Inaugural Committee, which put on the festivities and the formal swearing in of the judges. Then in early 2003, um, I don't think I took a leave of absence but I used some time or took some time off from the—when I'm saying didn't take a leave, I didn't take a specified period of time off, but maybe took a day or two here or there and was managing, uh, campaign for—Sue Smith ran for county commissioner and she was elected in, uh, 2003. Then she took office in January of 2004 at which time I again chaired what they called a County Swearing-In Ceremony for the county row offices. Um . . . .

Q. Have you served in any elected capacities? Were you ever elected by the community to serve in any particular office?

A. Yes, I still am a Cranberry Township Auditor; I have been for 27 years—24—about 22 years as elected and I believe 5 years as appointed or a total of 5 years in an appointed capacity.

Q. Okay.

A. Then in 2005, January of 2005 I was appointed by the county commissioners to the county housing authority. I served as chairman of that authority for about 5 ½ years; that's an unpaid position. In 2005 I was appointed by Venango County Court of Common Pleas to serve as, um, trial administrator for a major homicide trial in the county, and that was a paid position. I think that kept me from about August until the end of October working in that function. Then in 2006, April 29th of 2006, I became president of Airboat Drive Units.

Keep in mind that from 1979, uh, I'm gonna try to make sure that I don't just assume you know things that maybe you haven't heard. In 1979—Airboat Drives was incorporated in 1978. In 1979, uh, my father and mother wanted me to chairman of the board. Now, I was gonna say I was probably 21 or 22 years old then, but I became chairman of the board. I kept that position until April of 2006, for 27 years. When both parents were living and when my mother was—survived my father and then even afterwards.

Um, I got up to where then I became president. So I was no longer was chairman of Airboat Drives in April 2006, became president, uh, and was also chief executive officer of the company.

N.T. Trial, 12/13/11, at 178-80.

We reproduce in part the Commonwealth's cross-examination of Appellant:

[Commonwealth]. I believe you testified on Tuesday that you held a position with a local law office for a period of 10 years, is that correct?

[Appellant]. Yes.

Q. And would that be the law office Wayne H. Hundertmark?

A. Yes.

Q. Can you tell the jury, please, how your employment with Mr. Hundertmark ended?

A. Um, my services were no longer needed. You were fired, is that right? Terminated, yes.

Q. Okay, and why was it that you were fired?

A. Um, we—

[Appellant's counsel]: Your Honor, I'm gonna object to that, I don't know how that's relevant.

[Commonwealth]: We should probably approach, Your Honor.

The court: Yes, I think so.

(The court and both counsel in chambers)

The court: I am concerned how—Whether or not they are hearing our sidebars in there. Okay, what is the incident?

[Appellant's counsel]: He was fired, he answered it.

[Commonwealth]: No, the answer is that he was double-dipping; that he was collecting unemployment while he was employed with Mr. Hundertmark. Clay Campbell did the accounting and discovered that he was double-dipping. He put his character at issue. He did this long employment history and all of his good service to the community and I think it's entirely relevant.

The court: Well, let us back up. I do not remember the good service to the community. Obviously, I have been listening to be sure because I am having to deal with the conviction. But what good service—What are you talking about good service to the community?

[Commonwealth]: Well, that's how [Appellant's counsel] prefaced the series of questions: Can you please tell us how you've been employed in the community and how—what are your other community involvement, and he went on to list these campaigns and how he's specially appointed to the courts, and this employment goes hand-in-hand with that. I mean, he's holding himself out as a legitimate paralegal and someone trusted by the legal community, and I believe that the specifics are quite contrary to that.

The court: Okay, you know, that is the first time I ever heard it. I mean, I was aware that they had a parting but I did not realize it was—Hundertmark is a skilled criminal lawyer but at times he gets, uh, harassible [sic]. It is

interesting; I never knew what happened there. I just know the two of them have not spoke, I guess, since then. Well—

[Appellant's counsel]: I don't think I've opened any kind of door asking his vorous [sic]. I mean, the stand—

[Commonwealth]: His voracity [sic] is—

[Appellant's counsel]: Because he takes the stand—

[Commonwealth]: Yes.

[Appellant's counsel]: —and testifies that he has a work history and that he's done this for the community. I mean, he was the trial administrator—a paid trial administrator for the court. He's not supposed to say that?

The court: I do not know. I do not know—he did not have to say it, certainly. He did not have to say that.

[Appellant's counsel]: Say what?

The court: That.

[Commonwealth]: He didn't have to be—You could have left it at what's his employment at Airboat. You could have left it at what's your related experience. You went on and asked, what kind of community involvement have you had.

[Appellant's counsel]: Well, the fact that he's the father of four kids, are you gonna bring in the fact that he smacks them in the face? I mean—

[Commonwealth]: If he were charged with that I'd probably try.

[Appellant's counsel]: He isn't charged with anything here.

[Commonwealth]: He's investigated, audited, and—

The court: Do you have any other things up your sleeve that we need to talk about now before we—?

[Commonwealth]: I think he's opened the door to the IRS issues and his expenses, absolutely.

The court: Oh, the IRS issues and his expenses.

[Commonwealth]: The expenses that he claimed—

The court: With regard to this.

[Commonwealth]: With regard to the 1099 that he claimed. I think he's opened the door to that.

[Appellant's counsel]: How has he opened the door to that? I mean, he issued himself a 1099; that was reversed by Rob Eakin at Rob Eakin's direction to the accountant. How does that open the door to anything about it?

[Commonwealth]: It's not just that, he makes all these claims against Robert Eakin and his expenditures related to Century Propeller and he does the same thing with the magazine and then can't justify it to the IRS.

The court: I am going to allow the termination as to Hundertmark; I am going to allow that. I am not going to allow the IRS at this point.

[Commonwealth]: Okay, what about with the fact that he refers Rob to the IRS and the IRS has subsequently cleared Robert? Can I test his knowledge of that? I mean, I have the letter—

The court: Do you know that to be true?

[Commonwealth]: Yeah, I have Rob's accountant and I have the letter that Steve wrote to the IRS. And it directly addresses all of the Century Propeller expenses.

[Appellant's counsel]: He brought that up from the standpoint of a basis for questioning Rob on the operation of the companies over the years; he confronted him with it. He was trying to establish why they had this falling out.

The court: Okay—I am going to—I will allow that. I am not going to allow, at this point, the IRS has made a ruling—

[Commonwealth]: As to him.

The court: --as to his expenses. If you had an IRS agent here to testify I would allow it, but I think you—just an incredible hearsay issue there.

[Commonwealth]: Okay.

The court: On the other you are okay, you can do that.

[Appellant's counsel]: I wanna be clear on what the court's ruling is, is this on the—on Hundertmark's employment?

The court: On Hundertmark's employment and on his reporting Rob to the IRS.

[Appellant's counsel]: He reported Rob to the IRS?

The court: Yes.

[Appellant's counsel]: Okay.

The court: Do you have anything else like that that we need to—that you think you need to ask for a sidebar to bring out?

[Commonwealth]: Those are the only inflammatory—

The court: You do know if you are going into uncharged misconduct you do need to ask for a side—One way to really get a judge upset with you is if you just—

[Commonwealth]: I know. I didn't do that yesterday—

The court: No, you did not—

[Commonwealth]: —and I'm not gonna do it today.

The court: Okay, but the point that we've been on a five-day trial, I realize you do five-day trials all the time. I think this is a very long trial.

[Commonwealth]: I don't wanna redo this.

The court: Okay, alright, there is nothing else that you think you need a sidebar on?

[Commonwealth]: No, and if he—If I think we're going somewhere with his answers to me I'll ask to approach.

The court: Okay, alright, we are alright then.

[Appellant's counsel]: Well, I'm objecting to the admission of this line of que—or the permitting of the—pursue this line of questioning.

The court: You do have a record as objecting to, first of all to the, my allowing her to ask him about the circumstances of his firing by Hundertmark and to the circumstances of him reporting Rob to the IRS on these transactions. I have ruled that she is not allowed to develop the fact the IRS is auditing him and in fact has made a finding that he is not entitled to these, uh—as I guess, expense or whatever they were.

[Appellant's counsel]: Alright, now my other concern here, Your Honor, and the objection I'm gonna raise is that, I don't want her to, you know, explore every single detail about this, especially if she's gonna—

The court: Detail about what?

[Appellant's counsel]: About this employment—unemployment thing and—

The court: Well, I think what she told us is her offer and I assume you are expecting him to answer these truthfully, right?

[Commonwealth]: I would hope.

[Appellant's counsel]: So the line of questioning is what? Isn't it true you were fired because you were collecting unemployment—?

[Commonwealth]: While you were collecting salary from Mr. Hundertmark.

The court: And then she will ask the leading question, because you were double-dipping with your salary and the unemployment.

[Appellant's counsel]: Okay, and then—

The court: Something like that.

[Appellant's counsel]: I just don't want her bringing any hearsay beyond that to try to establish that.

The court: That is what you are going to do, right?

[Commonwealth]: Mm-hm (affirmative response).

The court: Not a whole lot more.

[Commonwealth]: Right.

The court: Okay. Goes to credibility probably and I think he has opened the door in the sense that he did talk about, you know, doing things for the court and so on, that he was a paralegal—trained paralegal, that is all—goes into it.

So I am allowing it. It is problematic but on the other hand I think it is fair game; I think he has opened it. Okay, are we done?

[Appellant's counsel]: Yes.

[Commonwealth]: Yes.

The court: Okay.

(Court in open session at 2:36 p.m.)

[Commonwealth]: Sir, I believe I had asked you the basis or [sic] your termination by Mr. Hundertmark.

[Appellant]. The basis?

Q. Yes.

A. Um, as I recall I had cervical surgery on March 31st of 2003 and I was off for a period of four to six weeks and we had a dispute and he said, If you don't wanna work drop off your keys. And so we came to the conclusion that I was no longer gonna work there.

Q. The dispute related to your back surgery, is that your testimony?

A. About my—I had a cervical surgery and I was wearing a neck collar, but I was holding a post for someone to pound into the ground for a campaign and Wayne said that if you can do that you can work in the office.

Q. Okay, so it's your testimony then to this jury that you weren't actually terminated because you were collecting unemployment benefits while receiving salary from Mr. Hundertmark?

A. No, no, that's not my understanding at all. I don't recall ever collecting unemployment benefits while receiving a salary.

Q. Um, do you recall Clay Campbell doing an audit of your records and salary obtained by Mr. Hundertmark for the periods of January 1st, 2003 through March 28th, 2003?

A. I'm not sure what Clay did. I know he did accounting work there as well.

Q. That wasn't my question, sir. My question is whether or not you recall Clay reviewing your employment payroll records for that time period?

A. I don't recall that, no.

Q. You received unemployment benefits for the periods of

December 15th 2002 and May 17th, 2003, is that right?

A. I'm not sure—I know I ended up receiving unemployment benefits as a result of my employment there, but I don't remember the dates.

Q. And you told this jury that you were employed by Mr. Hundertmark for a period of 10 years starting in 1993, is that correct?

A. Yeah, I think I started in March of 1993.

N.T. Trial, 12/15/11, at 154-165.

The standard of review follows:

The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Further, an erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error is harmless.

An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless.

***Commonwealth v. Northrip***, 945 A.2d 198, 203 (Pa. Super. 2008)

(citations and formatting omitted).

Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Robinson*, 721 A.2d 344, 350 (Pa. 1998) (citation omitted).

Pennsylvania Rule of Evidence 404 states in pertinent part:

**Rule 404. Character Evidence; Crimes or Other Acts**

**(a) Character Evidence.**

*(1) Prohibited Uses.* Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

*(2) Exceptions for a Defendant or Victim in a Criminal Case.* The following exceptions apply in a criminal case:

(A) a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it . . . .

Pa.R.E. 404(a)(1)-(2).[5]  Rule 405 states in relevant part:

**Rule 405. Methods of Proving Character**

**(a) By Reputation.** When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation. Testimony about the witness's opinion as to the character or character trait of the person is not admissible.

(1) On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct probative of the character trait in question.

(2) In a criminal case, on cross-examination of a character witness, inquiry into allegations of other criminal conduct

---

[5] The present version of Rule 404 does not materially differ from the version in existence at the time of Appellant's trial.

> by the defendant, not resulting in conviction, is not permissible.

Pa.R.E. 405(a).

> [P]ursuant to Pa.R.E. 404(a)(1), an accused may choose to offer evidence of his or her good character. In order to prove this trait of good character, the accused may opt to introduce evidence of his or her reputation among associates or within a particular community. Pa.R.E. 405(a). However, if the accused offers such reputation evidence, the Commonwealth is permitted to cross-examine the character witness regarding "specific instances of conduct probative of the character trait in question . . . ." ***Id.***

***Commonwealth v. Fletcher***, 861 A.2d 898, 915 (Pa. 2004). Thus, in ***Fletcher***, because the defendant presented "reputation evidence as to his character for peacefulness and non-violence, [the defendant] 'opened the door' for the Commonwealth to cross-examine his character witness regarding specific instances of conduct probative of the character trait in question." ***Id.*** at 916 (citing Pa.R.E. 405(a)).

In ***Commonwealth v. Percell***, 454 A.2d 542 (Pa. 1982),[6] our Supreme Court examined whether a defendant put his character in issue after testifying about his employment:

> [The defendant] took the stand and, in the course of identifying himself, testified to certain "historical" facts regarding his residence in the neighborhood where the crime occurred, his family and **his employment status**.

---

[6] We may rely on cases predating adoption of the Pennsylvania Rules of Evidence as long as those cases comport with the rules. ***See Commonwealth v. Aikens***, 990 A.2d 1181, 1185 n.2 (Pa. Super. 2010).

> Arguing [the defendant] had thus put his character in issue, the prosecutor announced her intention to impeach [the defendant's] "reputation" evidence by prior convictions. These crimes were not crimen falsi and, thus, could not be admissible to impeach [the defendant's] credibility. *See Commonwealth v. Roots*, 482 Pa. 33, 393 A.2d 364 (1978). **Because [the defendant's] testimony did not describe his reputation in the community either generally or as it would relate to the crimes presently charged**, the lower court ruled evidence of these prior crimes inadmissible. Nevertheless, the prosecutor persevered: "Anything happen to you in 1972 that would prevent you from now and evermore from having a license to carry a gun?" A timely objection was sustained.

*Id.* at 544 (emphases added). The prosecutor nonetheless persisted in attempting to have Appellant testify about a 1972 prior criminal conviction. *Id.* at 544-45. In conjunction with other misconduct by the prosecutor, the *Percell* Court remanded for a new trial. *Id.* at 546.

Instantly, Appellant's testimony about his prior employment at a law office, similar to the defendant in *Percell*, did not "describe his reputation in the community either generally or as it would relate to the crimes presently charged." *See id.* at 544. We acknowledge, however, that Appellant was then asked to discuss the positions he held in the community, how he served the community, and the elected positions he held. *See* N.T. Trial, 12/13/11, at 178-80. Appellant's subsequent testimony arguably implicated his community reputation and thus conceivably opened the door to the reasons for his termination. *Cf. Percell*, 454 A.2d at 544.

Nonetheless, assuming the trial court erred, we ascertain whether such error was harmless. *See Northrip*, 945 A.2d at 203. After careful consideration of the certified record, we are convinced that the "properly admitted and uncontradicted evidence of guilt," was such that this error did not contribute to the verdict. *See id.*; *see also Robinson*, 721 A.2d at 350; Trial Ct. Op. at 6-16 (summarizing evidence substantiating Appellant's convictions).

Appellant next argues that the court erred by publishing Commonwealth Exhibits 14, 25, 27, 28, 29, and 31 to the jury.[7] Appellant claims that four of the exhibits were corporate minutes memorializing out-of-court statements and other matters associated with his crimes. He alleges the two remaining exhibits were copies of letters written by corporate officers regarding his actions. In sum, he complains that the exhibits contained hearsay or witness statements that unduly influenced the jury. We hold Appellant is due no relief.

As a prefatory matter, none of the admitted trial exhibits are part of the certified record. "[I]f a document is not in the certified record, the Superior Court may not consider it." *Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) (*en banc*) (citation omitted). It is Appellant's responsibility to ensure the record is complete prior to its transmission to

---

[7] The vast majority of the trial exhibits were published to the jury without objection.

this Court. **See generally Commonwealth v. Williams**, 715 A.2d 1101, 1104-05 (Pa. 1998). Our Supreme Court, however, held "that where the accuracy of a pertinent document is undisputed, the Court could consider that document if it was in the Reproduced Record, even though it was not in the record that had been transmitted to the Court." Pa.R.A.P. 1921 note (citing **Commonwealth v. Brown**, 52 A.3d 1139, 1145 n.4 (Pa. 2012)). In this case, Appellant included Commonwealth Exhibits 25 and 31 as part of his reproduced record. As the Commonwealth does not dispute their accuracy, we will consider Appellant's arguments limited to those two exhibits. **See id.**

Briefly, Commonwealth Exhibit 25 consists of unsigned corporate minutes purportedly memorializing a December 14, 2006 meeting of the board of directors. R.R. 46a. Appellant objected on the basis that the minutes are testimonial as they are "an abbreviated transcript of a meeting of what parties are saying, actions that are being taken." N.T. Trial, 12/16/11, at 86, 91. The court reasoned that the minutes corroborate the occurrence of the December board meeting and support both side's theories of the case, as follows. Appellant's position is that the minutes authorized him to execute the allegedly fraudulent transaction. **See generally** N.T. Trial, 12/15/11, at 196-97. The Commonwealth countered that other evidence established that the minutes were created several months after the corporate meeting. **See id.**

Commonwealth Exhibit 31 is an April 16, 2007 letter ostensibly memorializing an April 12, 2007 telephone conversation between Richard Eakin and an accountant regarding Appellant's unauthorized withdrawal of funds. R.R. at 64a-65a. Appellant did not state a basis for his objection. N.T. Trial, 12/16/11, at 94. Regardless, both the Commonwealth and Appellant agreed that Exhibit 31 was read to the jury and displayed "on the big screen." *Id.* Additionally, both exhibits were admitted into evidence.

"Whether an exhibit should be allowed to go out with the jury during its deliberation is within the sound discretion of the trial judge." ***Commonwealth v. Barnett***, 50 A.3d 176, 194 (Pa. Super. 2012) (citations omitted). Pennsylvania Rule of Criminal Procedure 646 applies:

> **Rule 646. Material Permitted in Possession of the Jury**
>
> (A) Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C).
>
> &ast; &ast; &ast;
>
> (C) During deliberations, the jury shall not be permitted to have:
>
>> (1) a transcript of any trial testimony;
>>
>> (2) a copy of any written or otherwise recorded confession by the defendant;
>>
>> (3) a copy of the information or indictment; and
>>
>> (4) except as provided in paragraph (B), written jury instructions.

Pa.R.Crim.P. 646(A), (C).

> The underlying reason for excluding certain items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice per se and the error is harmless.

***Barnett***, 50 A.3d at 194 (citation omitted).

In ***Commonwealth v. Sparks***, 505 A.2d 1002 (Pa. Super. 1986), the trial court published to the jury several photographs of the victim's injuries. ***Id.*** at 1006. The ***Sparks*** Court discerned no abuse of discretion under the prior version of Rule 646, as the photographs aided the jury's deliberations, "were relevant, admitted into evidence, and requested by the jury." ***Id.***

Instantly, we discern no abuse of discretion by the trial court. Commonwealth Exhibit 25 supported both the Commonwealth's and Appellant's theory of the case. Commonwealth Exhibit 31 was displayed and read to the jury. Under these circumstances, we cannot conclude that publication of either exhibit placed undue emphasis or credibility on the material. ***See Barnett***, 50 A.3d at 194. The exhibits were not barred by Rule 646(C), were relevant, and were admitted into evidence. ***See Sparks***, 505 A.2d at 1006.

For Appellant's last issue, he maintains the trial court erred by permitting the Commonwealth to introduce "forensic computer hearsay evidence" in an attempt to impeach him. Appellant claims such use was

impermissible impeachment and unfairly prejudiced him. We discern no basis for relief.

We reproduce the disputed exchange below:

> [Commonwealth]. Okay. The December 14th, 2006 minutes, um, were marked, not admitted, as Commonwealth's Exhibit 25.[8] Could you look at that document, please?
>
> [Appellant]. Okay.
>
> Q. Does that look familiar to you?
>
> A. Yes.
>
> Q. Do you believe that those are the minutes that you drafted and would have attempted to attach an e-mail to Shawn Eakin?
>
> A. I thought they were attached, um—Yeah, these are the minutes.
>
> Q. And when would you have created those, sir?
>
> A. I'm not sure if they would have been done—they aren't always done right away right after a meeting; they could have been done in January or early February even.
>
> Q. Well, if our computer forensic records reflect that that document was created on February 13th—
>
> [Appellant's counsel]: I'm gonna object, that's hearsay.
>
> [Commonwealth]: You have the records and I think I can ask him if he knows that it was created on the 13th of February.

---

[8] As noted above, the court subsequently admitted Commonwealth's Exhibit 25 into evidence.

[Appellant's counsel]: I don't think those records were admitted into evidence. I don't think that's fair. I don't think they're—that's record evidence at this point. Just because she furnished it to me doesn't mean it's in evidence for discussion.

The court: I am going to allow the question but you are stuck with the answer, you know that.

[Commonwealth]: I understand.

The court: Okay.

[Commonwealth]. If we have computer records that indicate that those minutes were created on February 13th, 2007 would that comport with your memory?

[Appellant]. No, but it's the same date that I sent him the e-mail.

Q. Well in this e-mail you talk about reconstructing some of the minutes and discussions. Is that your regular practice?

A. Sometimes you could do that. Um, again it's a matter of the degree of formality.

N.T. Trial, 12/15/11, at 195-96.

As noted above, the standard of review is abuse of discretion. *See*

*Northrip*, 945 A.2d at 203. Pennsylvania Rule of Evidence 801 defines

hearsay as follows:

**(c) Hearsay.** "Hearsay" means a statement that

(1) the declarant does not make while testifying at the current trial or hearing; and

(2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa.R.E. 801. The comment to 801 states in pertinent part, "Communications that are not assertions are not hearsay. These would include questions, greetings, expressions of gratitude, exclamations, offers, instructions, warnings, etc." Pa.R.E. 801 cmt. Instantly, the district attorney is not testifying and the alleged hearsay is phrased within an apparent hypothetical question on cross-examination. *See* Pa.R.E. 801 & cmt. Thus, Appellant's argument lacks merit.[9] ***See Northrip***, 945 A.2d at 203. Even assuming, however, that the question somehow encompassed or otherwise requested hearsay, Appellant had previously conceded that the minutes could have been created in "January or early February." N.T. Trial, 12/15/11, at 195. Accordingly, we would discern no abuse of discretion, ***see Northrip***, 945 A.2d at 203, and affirm the judgment of sentence.

Judgment of sentence affirmed.

President Judge Emeritus Bender joins the memorandum.

Judge Olson concurs in the result.

---

[9] We cannot reverse on an argument not raised by Appellant. ***See*** Pa.R.A.P. 302.

J. A19033/14

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/2015

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA :

v. : C.R. No. 115-2011

STEVEN GREGORY EAKIN, **SCANNED**
    Defendant

## OPINION OF COURT

AND NOW, this 25th day of June, 2013, the court has before it the Concise Statement of Errors Complained of on Appeal filed by the Defendant in the above captioned matter in accordance with Pa.R.A.P. 1925(b).[1] The court now issues the following opinion in support of its prior decision.

### Procedural History

On December 16, 2011, Defendant was convicted by a jury after trial of one (1) count of Theft by Unlawful Taking, in violation of 18 Pa.C.S. § 3921(a), a Felony 3; one (1) count of Theft by Deception, in violation of 18 Pa.C.S. § 3922(a)(1), a Felony 3; one (1) count of Theft by Failure to Make Required Disposition of Funds Received, in violation of 18 Pa.C.S. § 3927(a), a Felony 3; and one (1) count of Misapplication of Entrusted Property, in violation of 18 Pa.C.S. § 4113, a Misdemeanor 2. Defendant was sentenced on February 7, 2012, to serve a prison term of six (6) months to twenty-four (24) months less one day concurrent with a probationary term of twenty-four (24) months. We imposed no sentence on the charges of Theft by Deception and Theft by Failure to Make Required Disposition of Funds as we found those charges merged with the charge of Theft by Unlawful Taking for sentencing purposes. On February 17, 2012,

---

[1] Defendant's pleading was actually titled "Concise Statement of Matters Complained of on Appeal," however the Court notes that the Pennsylvania Supreme Court by its Order dated May 10, 2007, changed the title of Pa.R.A.P. 1925 to "Concise Statement of Errors Complained of on Appeal". *In re Order Adopting Amendments to Pa.R.A.P. 1925* (May 10, 2007).

1

Defendant filed a Post-Sentence Motion, requesting an arrest of judgment or, in the alternative, a motion for a new trial. Defendant's Post-Sentence Motion was denied in our Order of Court dated February 22, 2012. Defendant filed his Notice of Appeal on March 21, 2012. That same day, Defendant also filed with this court a Concise Statement of Errors Complained of on Appeal in accordance with Pa.R.A.P. 1925. On May 23, 2012, Defendant filed his Motion for Production of Trial Transcripts, which we granted by Order of Court dated May 31, 2012. The trial transcripts were completed August 31, 2012. We now file our 1925(a) Opinion.[2]

## *Factual Background*

Airboat Drive Units ("ADU") was a small family corporation started by the father of the Defendant Steven Eakin and his brother Robert Eakin ("Rob") to supply machine parts for airboats. As the father eased out of the business and eventually passed away, Rob, skilled as an engineer, pretty much ran the technical side of the business, while the Defendant though somewhat involved was not as involved in the day-to-day operations as was the case with Rob. Rob and the Defendant each owned 45% of the stock and their nephew, Shawn Eakin ("Shawn") had 10%.

In the spring of 2006, management disputes arose and the Defendant secured Shawn's vote to oust Rob from running ADU and installed himself as the president of the company. Rob then left ADU and focused his attention on running his company, Century Propeller Corporation ("Century"), that until then had been a companion company providing engineering and product development to ADU, but as the result of the rupture in relationships became a competing company to ADU. The Defendant had been

---

[2] We are cognizant of the timeframe involved in issuing our 1925(a) Opinion, and are grateful for the extension afforded us in issuing our Opinion. See Pa.R.A.P. 1931(a)(1).

2

admonished not to make any more draws from ADU because, according to Rob, he had already made disproportionate monetary advances to himself.

In June of 2006, the Defendant fired ADU's bookkeeper and the very next day opened a checking account at National City Bank ("National City account") for a company called Applied Airboat Drive ("AAD") and thereafter deposited the preponderance of corporate receipts made out to ADU to AAD in that distinct account rather than ADU's long-time corporate account at Northwest Savings Bank ("Northwest account"). In addition, up until the time of the National City account being opened, ADU corporate policy had a two signature requirement for any checks, including draw checks, issued by the corporation. However, the National City account required the Defendant's signature only. He did not tell the other shareholders about this new account. In the course of a few months, the Defendant had remitted to himself approximately $72,000.00, in draws, in addition to a monthly salary of $3500. According to the Commonwealth, the Defendant also used the National City account to pay for personal expenses, most notably from Wal-Mart.

By happenstance, in October 2006, Rob learned of the new account and began inquiries. The long-time corporate accountant, who had for years stopped by the office a couple times each month was unaware of the new checking account until Rob's inquiry in late October 2006. Once the accountant queried the Defendant, the National City account records were given to the accountant.

The forensic evidence presented by the Commonwealth showed that the Defendant had constructed many of the documents at one distinct time and had done so only after Rob began his inquiries. So much of the Commonwealth's case turned on

3

demonstrating that the Defendant attempted to cover up his actions. The Defendant contended he had acted openly and within his authority and much of the money (at least $35,000.00) was paid out to himself by virtue of his being a contractor to ADU for the development of a web magazine to market ADU's product lines. Shawn, the other officer, denied approving the Defendant's expenditures and did not remember the meeting wherein the Defendant contended Shawn allegedly concurred in the financial outlay for the web magazine and payments to the Defendant. Both sides presented written evidence which consisted of corporate minutes and resolutions, bank records and copies of cancelled checks, business invoices, e-correspondence, and computer records. The Commonwealth presented forensic computer records, along with accompanying testimony as to evidence of deleted entries from ADU's corporate computer that was revealed on the hard drive. Essentially, the Commonwealth contended that the Defendant embezzled well in excess of $72,000.00, from ADU, while the Defendant's theory was that he acted openly and within his authority as president of the company.

*Analysis*

Defendant assigns the following six (6) errors which we have taken from his concise statement:

1.    The trial court committed an error of law and abused its discretion for failing to arrest the judgment against the Defendant as the Commonwealth's evidence was insufficient to sustain the verdict of December 16, 2011, for the following reasons:

   a. As to each offense, the Commonwealth failed to establish by the quantum and quality of evidence beyond a reasonable doubt the requisite state of mind, i.e., the Defendant's criminal intent to permanently deprive any of the alleged victims of corporate assets or their respective interests therein;

4

b. As to each offense, the Commonwealth failed to establish by the quantum and quality of evidence beyond a reasonable doubt that the Defendant lacked the authority to treat corporate assets as his own where he took shareholder draws and paid for his research and development consistent with the prior established custom and practice of other corporate shareholders and directors; and

c. As to each offense, the Commonwealth's evidence permitted two equally reasonable and mutually inconsistent inferences to be drawn from the same set of circumstances, one in support of guilt and one in support of innocence, such that the jury should not have been permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty.

2. The trial court committed an error of law and abused its discretion for failing to grant the Defendant a new trial as the verdict of December 16, 2011, was against the weight of the evidence for the following reasons . . . incorporat[ing] by reference herein the reasons set forth in support of his motion for arrest of judgment for the proposition that:

[a.] the verdict is so contrary to the evidence as to shock one's sense of justice; and

[b.] the probative force of the evidence or weight of the evidence only marginally supports the verdict.

3. The trial court committed an error of law and abused its discretion by allowing the Commonwealth, on cross-examination of the Defendant, to introduce unrelated and uncharged evidence of Defendant's purported prior bad acts or dishonest conduct surrounding Defendant's termination by a former employer.

4. The trial court committed an error of law and abused its discretion [by] permitting the jury to receive and consider in its deliberations Commonwealth Exhibits 14, 25, 27, 28, 29, and 31, all of which contained hearsay and/or witness statements which permitted the jury to place undue emphasis on such

5

hearsay and statements as opposed to live witness testimony subject to cross-examination.

5. The trial court committed an error of law and abused its discretion in allowing the Commonwealth, on cross-examination of the Defendant, to introduce over Defendant's objection, forensic computer hearsay evidence outside of the trial record in an attempt to impeach Defendant's testimony; and

6. The trial court committed an error of law and abused its discretion for failing to grant the Defendant a new trial for the reason that the Commonwealth was permitted to introduce third-party hearsay testimony and evidence through its rebuttal witness to improperly bolster the credibility of and rehabilitate a Commonwealth witness.

*Concise Statement of Matters Complained of On Appeal*, C.R. No. 115-2011, March 21, 2012, 1-3.

Preliminarily, we note that most of the claims seem to attack the sufficiency of the evidence, while other claims allege abuse of our discretion in allowing testimonial evidence or evidence such as exhibits or forensic computer analysis into the record. We shall address the alleged errors *seriatim*.

### i. Alleged Error One

The Defendant alleges this court abused its discretion and erred by failing to arrest the judgment as the Commonwealth's evidence was insufficient to sustain the verdict handed down on December 16, 2011. In justifying this contention, the Defendant disputes the "quantum and quality" of the evidence adduced by the Commonwealth and alleges it failed to establish beyond a reasonable doubt the requisite state of mind necessary to commit the charged theft or, even if he did the charged acts, he had the authority to do them for he was merely doing what others in the corporation before him had done. He further contends the evidence permitted for two equally reasonable, but

6

inconsistent results which impermissibly allowed the jury to guess which inference it would adopt.

An abuse of discretion occurs if there was an error of law or the judgment was manifestly unreasonable or the result of partiality, prejudice, bias or ill will. *Silver v. Thompson*, 26 A.3d 514, 516 (Pa. Super. Ct. 2011) (citing *Kring v. Univ. of Pittsburgh*, 829 A.2d 673, 675 (Pa.Super.2003)). The test for sufficiency is whether, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth, the fact-finder reasonably could have determined that all the elements of the crime were established beyond a reasonable doubt. *Commonwealth v. Mackert*, 781 A.2d 178, 186 (Pa. Super. Ct. 2001).

We acknowledge at the outset that this was a five day trial with extensive testimony and copious amounts of exhibits being introduced as evidence by both parties. Learned counsel on both sides zealously and effectively advocated for their respective client. Obviously, the Commonwealth's theory centered around its contention that the Defendant was a thief and an embezzler whose greed and subsequent cover-up precipitated the destruction of a closely-held family company that had been in existence for nearly thirty years. Conversely, the defense's theory centered around his contention that far from destroying the family business, the Defendant attempted to save the family business and that his brother, Rob, jealous of losing control in the company, set about to compete against the family company and essentially destroy it. At the end of the day, the jury chose to believe the Commonwealth's theory, and that is their prerogative as fact-finder.

7

As noted above, the Defendant alleges the Commonwealth did not show beyond a reasonable doubt either the requisite criminal state of mind or that the Defendant was not authorized to take the actions he took. We disagree. During the trial and now as we review our notes and trial transcripts, we referenced *Commonwealth v. Gallo*, 373 A.2d 1109 (Pa. 1977) and especially Judge Cercone's dissent in our superior court's opinion at *Commonwealth v. Gallo*, 345 A.2d 747, 751 (Pa. Super. Ct. 1975), which the Pennsylvania Supreme Court seemed to follow. *Gallo* involved the issue of whether the matter was criminal false pretenses or simply a business dispute that did not belong in criminal court. Judge Cercone concluded that the Commonwealth's evidence did not establish the intent to deceive necessary to make the matter criminal. What strongly distinguishes this case from *Gallo* is the compelling, almost overwhelming, evidence the Commonwealth adduced in this case to show the attempts by the Defendant to cover up his actions and make them appear legitimate. We tell the jurors in our charge that sometimes circumstantial evidence is more compelling than direct evidence and clearly such was the case here. The Commonwealth introduced evidence that the Defendant diverted funds from the family business account for ADU at the Northwest account by covertly opening up another checking account for AAD at the National City account in Cranberry, Pennsylvania in June of 2006. See N.T. Jury Trial Day 1, pp. 47-69. The National City account retained the same EIN or Federal Identification Number as the account for ADU and the Defendant used the same business stamp for ADU as he did for AAD in depositing funds into the National City account. *Id.* at 47, *ll.* 7-16 *compare with* p. 71, *ll.* 15-21; p. 72, *ll.* 2-6. Moreover, testimony adduced from Special Agent Philip Larcinese, III, of the Pennsylvania Attorney General's Office, who executed the search

warrant on National City Bank for the records of Defendant's account there, established that $72,870.18, was deposited into this account, of which $63,067.16 was paid directly to the Defendant. *Id.* at p. 69, *ll.* 2-12. According to Agent Larcinese's testimony, the discrepancy between the two numbers was simply the result of giving the Defendant the benefit of the doubt that other payments made to other creditors such as Wal-Mart and banking institutions could have been legitimate business expenses.[3] *Id.* at 69, *ll.* 8-23; see also Commonwealth's Exhibit 10. Finally, on cross, Agent Larcinese's testimony established his belief that the address used to open the National City account mirrored the address for ADU, even though the name on the National City account was designated for AAD. *Id.* at 70, *ll.* 4-11; 71, *ll.* 2-6.[4] In addition, Agent Larcinese testified that the National City account was opened on June 29, 2006. See N.T., Jury Trial Day 1, p. 56, *ll.* 9-13. This was corroborated by the Defendant's testimony. See N.T., Jury Trial Day 4, p. 189, *ll.*17-18; p. 191, *ll.* 8-10. The Defendant maintained that the National City account was opened during a chaotic and uncertain time for ADU. *Id.* at p. 183, Line 20 – p. 184, Line 10. The chaos, per the Defendant, explained the motive behind the opening of the National City account. *Id.* However, evidence was also adduced that contrary to the standard business practice of ADU, two signatures were not required to draw money from the AAD's National City account. *Id.* at 184-85. The Defendant explained that the two signature safeguard was not used with the National City account

---

[3] Other checks written out from the National City account were to institutions such as Merit Bank, Shop N Save, Central Electric, Sheetz, CitiFinancial, and HSBC Card Services. See N.T., Jury Trial Day 1, p. 65, *ll.* 1-8. However, testimony from Robert Eakin adduced copies of receipts from Wal-Mart which showed Defendant wrote check purchases from the corporation's account to pay for such items as groceries and clothing. *See id.* at p. 121-23; Commonwealth Exhibit 12.

[4] Further testimony from Agent Larcinese established that a P.O. Box address was added to banking statements from National City, a fact of some importance more fully developed during the trial. See N.T., Jury Trial Day 1, p. 74, *ll.*19-24; see also N.T., Jury Trial Day 4, pp. 198-99 (Defendant testifies he may have added a P.O. Box to the National City account when he opened it despite the fact that ADU had never used a post office box address before).

because its set-up was done hurriedly. *Id.* at 184, *ll.* 8-16. Not only was the two-signature requirement safeguard not adhered to, but also the Defendant was the only person on the National City account and the only one able to access it. *Id.* at *ll.* 11-23. While the Defendant maintained that there was no hiding of the existence of the account, testimony from the Defendant revealed that the account was opened subsequent to the firing of ADU's book-keeper, Jill Docherty, who no longer worked for ADU as of June 23, 2006. Furthermore, Rob, the brother who had previously controlled day-to-day operations at ADU, was voted out of office by the other shareholders, one of whom was the Defendant, and barred from accessing the building where ADU was housed as of June 29, 2006, the day the account was opened.[5] See N.T. Jury Trial Day 4, p. 190, *ll.* 4-7. While the Defendant contends the ledger book for the National City account was kept in the desk at ADU and on the business computer, accessible to anyone, testimony adduced at trial pointed to the fact that anyone, other than the Defendant, who might have known to look for the existence of the National City account no longer had access to ADU's building or its records. Thus, for all practical purposes, despite the Defendant's contention that the account was not opened in a covert fashion, no one knew of its existence until November of 2006, when Rob became aware of an Airboat Drive account at National City Bank.[6] Following a cursory investigation in which a telephone call was made to National City Bank, Rob was informed that an active account for AAD existed that had a substantial amount of funds passing through it and that the account had the

---

[5] Rob was ousted as president of ADU at the shareholders' meeting in April 2006. While he retained his forty-five (45) percent stake in ADU he had no control over day-to-day operations at ADU. See N.T. Jury Trial Day 1, p. 99, *ll.* 7-24.

[6] Rob became aware of the National City account through what can only be termed serendipitous circumstances. During a conversation with the mailman, Rob observed an envelope with correspondence from National City Bank for an "Airboat Drive or Drivers." Rob thought that strange as ADU had never had an account with National City. See N.T. Jury Trial Day 1, p. 105, *ll.* 2-19.

same EIN number as ADU. See N.T. Jury Trial Day 1, pp. 105-06. Tellingly, the one person, other than the Defendant, who might have known about the account's existence was Shawn, the nephew of Rob and the Defendant, who was a minority shareholder in ADU. However, despite the Defendant's testimony that Shawn was informed of the account's existence, Shawn testified that he had no idea the account existed and was never informed the account had been opened. See N.T. Jury Trial Day 4, pp. 194-98; compare with N.T. Jury Trial Day 2, pp. 193, Ln. 17- p. 195, Ln. 13.[7] Moreover, Shawn testified he never authorized the opening of any account at National City Bank. See N.T. Jury Trial Day 2, p. 195, *ll.* 11-13. In addition, while not an officer of the company, even the long-time accountant, George Clay Campbell, who serviced ADU and did its corporate taxes did not know of the National City account until November of 2006, when he was informed of its existence by Rob. See N.T. Jury Trial Day 3, pp. 14-15. According to Mr. Campbell, when he queried the Defendant as to whether a second account existed, the Defendant replied that the account existed and that "he just hadn't gotten [its records] to [Mr. Campbell] yet." *Id.* at 16, *ll.* 3-8. While the Defendant continued to defend the creation of the National City account as above board and legitimate, the jury heard testimony that not only did nobody know of its existence for nearly five months, but also the other officer of the company, Shawn, did not know of its existence during that time, nor was his signature required on any withdrawals from that

---

[7] Defendant asserted that Shawn was informed of the account and its existence at a December 14, 2006 end of the year shareholder meeting which was reflected in an email attachment alleged to have contained the e-version of the meeting's minutes. See N.T. Jury Trial Day 4, pp. 193-95. However, the emails sent by the Defendant to Shawn do not show any attached documents. *Id.* at 195, *ll.* 1-19. Shawn testified that while he remembered speaking generally with the Defendant about some of the topics alleged to have been discussed at this meeting, he did not remember attending the meeting nor did he remember the email containing the sentence in the minutes that read "[t]he new project has been funded by the corporation through its account at National City Bank with the costs to date being approximately $29,000.00." See N.T. Jury Trial Day 2, p. 195, *ll.* 3-24.

11

account as had been the practice with ADU and its corporate account at Northwest. In addition, the Defendant was the only authorized user for the National City account. Furthermore, corporate minutes purportedly authorizing the creation of the account at the December 14, 2006 meeting were not generated until February 13, 2007, the same date the Defendant sent an email to Shawn with the alleged attachment containing the minutes. See. N.T. Jury Trial Day 4, pp. 195-96.

The jury also heard testimony from Braden Cook, a special agent with the Pennsylvania Office of Attorney General Computer Forensic Unit. Agent Cook, analyzed the original hard drive seized from ADU's computer, the same computer used by Jill Docherty when logging in ADU's accounts receivable via the QuickBook application.[8] See N.T. Jury Trial Day 2, pp. 147-72. Utilizing a forensic software program, Agent Cook testified he was able to retrieve and view the register from within QuickBook for the National City account. Agent Cook testified that within QuickBooks, when a user entered information into the register, the system tracked the date and time the entry was made. In analyzing the contents of the register, Agent Cook ran a search for any transactions recorded from June 30, 2006 through March of 2007. *Id.* at 151, *ll.* 10-24. Subsequently, Agent Cook ran off a report showing that the earliest transaction for that account that QuickBook had a record of was for November 27, 2006, with the last entry entered on March 16, 2007. *Id.* at 153-54. Agent Cook further testified that most of the entries occurred on November 27, 2006. *Id.* at 154. Agent Cook also testified that when working in QuickBook, the program creates a normal working file, and the user has

---

[8] The QuickBook application was a program tool used by ADU that tracked not only invoices and payments but also allowed a user to keep a bank register of sorts for reconciliation purposes with the user's banking institution. ADU would bill its clients and keep track of their payments and input the payments as received for reconciliation with bank statements at the end of the month. See N.T. Jury Trial Day 2, pp. 14-15.

12

the option of creating a back-up file.[9] *Id.* at 154, *ll.* 16-18. The hard drive showed one normal working file for ADU and two back-up files for ADU from years 2005 and 2006. *Id.* at *ll.* 18-21. Agent Cook then retrieved from the back-up files for 2006 a list of every single account on file in QuickBook for the company and compiled the accounts into a document entitled a "Chart of Accounts." *Id.* at 154-55; see also Commonwealth Exhibit 21. Agent Cook testified that the National City account did not appear in either the "Chart of Accounts" or in a back-up file created on November 18, 2006. *Id.* at p. 156, *ll.* 2-17.

The jury also heard expert testimony from Robert Martin, Esq., a local attorney practicing in Franklin, Pennsylvania. See N.T. Jury Trial Day 3, pp. 136-75. Attorney Martin discussed one of his areas of legal expertise, that of corporate law, formation, financing and governance as it applied to ADU, a closely held corporation. He explained the differences in various corporate formations in existence under Pennsylvania law and noted that in a closely held corporation—most often associated with small, family-owned, businesses—those who own the company are also in control of its day-to-day operations. *Id.* at 144-47. Attorney Martin further explained that notwithstanding the familial ties that might underlie a small, closely-held family corporation, there are requisite formalities under Pennsylvania law that must be complied with. *Id.* at 149-50. The requisite formalities require *inter alia* that shareholder or directors' meetings be held and records of such meetings where resolutions or decisions are made be kept. It is typical, per Attorney Martin's testimony, that strict adherence to the corporate formalities

---

[9] The back-up file would be a mirror image of the information contained within the working file. Thus, if no entry regarding a certain piece of information showed up in the back-up file, such information would not be contained within the working file. See N.T. Jury Trial Day 2, p. 156, *ll.* 7-17 (discussing likelihood that the National City account entries might be found in another QuickBook file).

13

is not always the case in these family-run businesses. *Id.* Recognizing this, Attorney Martin testified, our courts generally do not hold closely held corporations such as ADU to the same level of formality, as that of a larger corporation. *Id.* at 150, *ll.* 12-16. This, then likely explains why ADU, operated as a family-run, closely held corporation did not always formalize decisions made by the operating officers. In fact, we heard testimony from Rob that often times informal meetings were held throughout the workday, various subjects talked about and things were just done. See N.T. Jury Trial Day 1, p. 85, *ll.* 1-16; p. 86, *ll.* 16-18. Frequently, such decisions never made their way into the board meeting minutes in a formalized way. Nevertheless, some corporate actions such as issuing shareholder draws from the corporate account did follow a recognized procedure. According to Rob, his mother put into place the requirement that any corporate checks issued by ADU required two signatures. *Id.* at pp. 86-87. As explained by Rob, a shareholder draw is a withdrawal of money from corporate profits that was not issued via direct payroll. *Id.* at p. 87, *ll.* 16-23. The shareholder draws were based upon the ownership share of the drawer relative to the corporate profit for the year.[10] However, as shareholder draws were issued out of the corporate account, a check had to be issued to the drawer, which triggered the two signature requirement. *Id.* at 87-88. Rob testified the requirement was mainly to ensure that draws were done in an even-handed fashion. *Id.* at 88, *ll.* 4-9. Rob further testified that towards the end of 2005, the Defendant had withdrawn a substantial amount of money via the shareholder withdrawals to the point that the draw share among the three principal shareholders was grossly unequal. *Id.* at p.

---

[10] The ownership shares in ADU were as follows: The Defendant had 45%, Rob had 45%, and Shawn had 10%. Thus, by way of example, in a year in which the company had corporate profits of $100,000, after payroll and corporate debts were paid, hypothetically, the maximum amount of shareholder draws allowable would be $45,000.00, $45,000.00, and $10,000.00, respectively.

14

94, *ll.* 6-22. The gross inequality in the draw amounts led to Rob's decision that he would not sign off on or authorize any more draws on behalf of the Defendant until the draws were equalized. *Id.* at pp. 95-98. Defendant contended the draws he took merely reflected like actions on the part of Rob or Shawn, the other primary shareholders who also took draws as payments for research and development done on behalf of ADU. *See Concise Statement*, 1.b. While the Defendant was free to take this position, obviously the jury felt otherwise in light of the testimony adduced at trial. We note that Shawn did testify that Rob developed various product lines for ADU which serviced ADU customers throughout the years prior to the latter's discontinuing his association with ADU. See N.T. Jury Trial Day 2, pp. 217-19. Testimony did adduce that Rob was compensated for such services as the company through which he serviced ADU's research and development was paid approximately $60,000 to $70,000.[11] See N.T. Jury Trial Day 4, p. 2, *ll.* 2-17. Shawn further testified that such research and product line development was done largely without the official approval of Shawn or the Defendant. See N.T. Jury Trial Day 2, pp. 217-19. However, in all fairness, such actions by Rob were not unusual given testimony that during the time he was in charge of daily operations, he essentially ran the technical design and engineering side of the business, often spending twelve hours a day developing product lines. See. N.T. Jury Trial Day 1, pp. 82-83, 93-94. As the result, ADU saw nearly a doubling of its gross sales from around $600,000 to nearly $1.2 million. *Id.* at p. 80, *ll.* 10- 19. Neither Shawn nor the Defendant was as involved in daily operations as Rob was. In fact, testimony adduced that the Defendant was not all

---

[11] Rob, while operationally in control of ADU also owned another company called Century Propeller Corporation ("Century") which provided the machine parts, research, engineering and development to ADU. Rob owned 97% of Century, while the Defendant owned 3%. See N.T. Jury Trial Day 4, p. 2, *ll.* 13-24. The agreement by which Century provided such services to ADU dated back to 1993 or 1994 and continued through until April 2006 when Rob left ADU. See N.T. Jury Trial Day 1, pp. 76-80.

15

that involved in the operations of ADU during many of the years that Rob worked there other than informal meetings a couple times a week. *Id.* at p. 84, *ll.* 4-24.

Subsequent to Rob's decision not to authorize further draws on behalf of the Defendant, testimony adduced that the level of acrimony increased between Rob and the Defendant and ultimately led to the Defendant calling a board of directors' meeting in April 2006, where the Defendant, with cooperation from the other shareholder, Shawn, removed Rob from operational control of ADU. *Id.* at p. 99, *ll.* 7-14. Although Rob, as shareholder, still retained a 45% shareholder interest in ADU, he no longer had control of day-to-day operations. The Defendant did. *Id.* at *ll.* 15-24. Two months later on June 29, 2006, the Defendant opened the National City account, the account whose existence, for all practical purposes, was known only to him. Given the circumstances surrounding the opening of the account, the fact that only the Defendant knew about the National City account and did not disclose its existence to either the other shareholders or the corporate accountant until prompted through inquiry, and the money paid directly to the Defendant for personal not business expenses was funneled through that account, the jury could reasonably believe there was criminal intent on the part of the Defendant to siphon funds from ADU for his personal use. Thus, we do not find that the evidence, taken together, was insufficient to render a guilty verdict. The jury viewed all the evidence submitted for its consideration as fact-finder and found that it established the Defendant's guilt beyond a reasonable doubt. Moreover, we do not find the judgment to be manifestly unreasonable or the result of partiality, bias, or ill will. *Thompson*, 26 A.3d at 516. The jury weighed each side's evidence, ultimately choosing to believe the Commonwealth. We, therefore, find this error to be without merit.

16

### ii. Alleged Error Two

The Defendant next contends we abused our discretion in not granting a new trial and alleges the verdict was so contrary as to shock one's sense of justice and the weight of the evidence only marginally supported the verdict. We disagree. Essentially, Defendant regurgitates the argument advanced at what is assigned as the first error in his Concise Statement and attacks the sufficiency of the evidence and alleges abuse of our discretion. As stated above, abuse of our discretion results only when the judgment is found to be the result of partiality, bias, or ill will. *Thompson, supra.* For the reasons articulated above, we find this error to be without merit as the verdict was adequately supported by evidence adduced through testimony at trial.

### iii. Alleged Error Three

The Defendant further contends we committed an error of law and abused our discretion in allowing the Commonwealth on cross examination to introduce allegedly unrelated and uncharged evidence of the Defendant's purported prior bad acts surrounding his past termination by a former employer. It is well settled that the admissibility of evidence is a determination left to the sound discretion of the trial court, and it will not be overturned absent an abuse of discretion or misapplication of law. *Reott v. Asia Trend, Inc.,* 7 A.3d 830, 839 (Pa. Super. Ct. 2010). An abuse of discretion is not mere error of judgment but, rather, involves partiality, prejudice, bias, ill-will, or manifest unreasonableness. *Commonwealth v. Schoff,* 911 A.2d 147, 154 (Pa. Super. Ct. 2006). Thus, in order for a ruling on the admissibility of evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party. *Reott,* 7 A.3d at 839.

17

The Defendant took the stand on the third day of trial and testified on direct to extensive civic activities in the community, including a court appointment as a trial administrator, as well as being employed as a paralegal at a local law office. See N.T. Jury Trial Day 3 pp. 178-80. We presume defense counsel's strategy was to showcase Defendant's character and commitment to the community as a way to contrast the charges leveled by the Commonwealth, essentially arguing that a person so dedicated to the good of the community would not act to defraud his own family. On cross-examination, the Commonwealth countered the good character evidence by adducing evidence that the Defendant was terminated from his employment as a paralegal for a local law firm due to his receiving a salary as a paralegal while also collecting unemployment benefits. See N.T. Jury Trial Day 4, pp. 164-65. While the Defendant testified he did not remember the dates he received unemployment compensation, thus could not recall whether that period corresponded to the time he was employed as a paralegal, nevertheless there was evidence that Defendant received unemployment from December 15, 1992 through May 17, 1993, and that he was employed as a paralegal beginning in March of 1993. *See id.* at p. 165, *ll.* 1-18. We allowed such testimony into evidence for we believed the Defendant did open the door as to his credibility as he talked about his work as a paralegal and the court-appointment he had. *Id.* at p. 163, *ll.* 11-19. We did have a conference with counsel in chambers where we heard from both sides regarding the admissibility of the testimony. The Commonwealth argued that in his questioning defense counsel put the Defendant's character at issue by laying out for the jury the "good service to the community" the Defendant had done by virtue of the position of trust into which he was placed by his employment as a paralegal, as well as

18

the work done as a former trial administrator for the county. *Id.* at pp. 155-56. We did not abuse our discretion in allowing evidence of Defendant's termination as a paralegal from a local law firm as defense counsel's questioning, as well as Defendant's testimony, opened the door on the issue of the Defendant's credibility. See Pa.R.E. 404(a)(1). Thus, we see no merit to this alleged error.

### iv. Alleged Error Four

Defendant further contends we committed an error of law and abused our discretion by permitting the jury to receive and consider in its deliberations Commonwealth Exhibits 14, 25, 27-29, and 31. The exhibits, per the Defendant, contained hearsay or witness statements that led the jury to place undue emphasis on them as opposed to live witness testimony subject to cross-examination. Quite simply, we disagree. We reviewed with counsel Pennsylvania Rule of Criminal Procedure 646 regarding what exhibits the jury could have in their deliberations. See Pa.R.Crim.P. 646(A), (C). That rule has been amended and, we believe, liberalized since we referred to it during this trial in December of 2011. Following our review of the rule, we determined that we would review the exhibits *seriatim* and rule on whether they would go to the jury after hearing any arguments from the parties. See N.T. Jury Trial Day 5, p. 82, *ll.* 17-22.

We allowed Commonwealth Exhibit 14, which was the April 29, 2006 minutes of the shareholders and directors meeting, to go to the jury. While the defense objected by arguing the exhibit contained a record or memorialization of conversations and, therefore, was testimonial in nature, the Commonwealth rebutted that assertion by stating it was important that the jury see the minutes, not so much for what they contained but rather to

19

evidence that some minutes were signed while others were unsigned, which tied into the Commonwealth's theory that the Defendant took unauthorized action. Ultimately, we concluded that since this was a document-intensive case and that the proofs proffered by both sides heavily depended upon the documents, it was better for the jury to be given the exhibits of corporate minutes and resolutions to aid in their deliberation. *Id.* at p. 86, *ll.* 7-9.

We allowed Commonwealth Exhibit 25, unsigned minutes reflecting an alleged conversation between the Defendant and Shawn on December 14, 2006, which purported to authorize the e-magazine project, to go to the jury. We believe the minutes provided the jury with context to the numerous corporate resolutions passed, in addition to the shareholder and director meetings that occurred at ADU. Moreover, we concluded the exhibit would be helpful for the jury in evaluating both the Commonwealth and defense theories of the case. *Id.* at p. 91, *ll.* 5-11.

We further allowed Commonwealth Exhibits 27 and 28, which were minutes of the shareholders and directors' meetings, respectively, held on March 17, 2007. Again, we concluded the allowance of such exhibits provided a helpful context for the jury in their deliberations. *Id.* at *ll.* 17-22.

We did allow Commonwealth Exhibit 29, the letter sent to National City Bank which was signed by Shawn regarding Defendant's unauthorized account there, to go to the jury. While defense counsel objected, we noted that between witnesses called by the defense and those by the Commonwealth, most of the letter's contents had been read into the evidentiary record, thus we saw no reason why the jury could not have the exhibit in their deliberation. See N.T. Jury Trial Day 5, pp. 92-93.

Finally, we did allow Commonwealth Exhibit 31, a letter sent to accountant Clay Campbell from Richard Eakin, then-president of ADU, stating that the Defendant had acted without authorization in removing funds from the National City account to be sent to the jury. Our rationale for doing so was similar to that of Commonwealth Exhibit 29. Moreover, both sides admitted the jury had heard the contents of the letter substantively, thus we saw no issue in sending the letter to the jury over Defendant's objection. *Id.* at pp. 93-94.

### v. *Alleged Error Five*

Defendant next contends we committed error of law and abused our discretion by allowing the Commonwealth to, over Defendant's objection, cross-examine the Defendant with forensic computer hearsay evidence outside the trial record to impeach the Defendant's testimony. We see no merit to this alleged error.

The defense's theory all along centered upon attempting to show that any alleged wrongful actions by the Defendant were either not wrongful as they were approved by the corporation as evidenced in corporate meeting minutes or not wrongful for the actions were similar to earlier actions taken by other corporate officers and shareholders. On direct, the Defendant testified *inter alia* that he had discussed the e-magazine project with Shawn. See N.T. Jury Trial Day 4, pp. 107-09. According to the Defendant, this discussion and alleged subsequent agreement to the project was done via a telephone call on December 14, 2006, and later set down in corporate minutes. *Id.* at p. 108, *ll.* 13-24. However, on cross by the Commonwealth, testimony adduced that according to Defense Exhibit H, an email string between the Defendant and Shawn commencing on February 13, 2007, purportedly showed minutes of the December 14, 2006 telephone call as an

21

attachment were not, in fact, attached. *Id.* at pp. 194-95. Furthermore, the Commonwealth evidenced that their computer forensic records reflected that the document Defendant claimed reflected the December 14, 2006 phone conversation was actually created on February 13, 2007, the same time the Defendant emailed Shawn. *Id.* at pp. 195-96. We allowed the Commonwealth the opportunity to query whether the December 14, 2006 minutes were actually created on February 13, 2007, but warned the Commonwealth it would be "stuck" with whatever answer the Defendant gave. *Id.* at 196, *ll.* 2-16. While Defendant acknowledged that the minutes are not always created contemporaneous to the meetings or discussions held, he could not recall when he actually wrote up the December 14, 2006 conversation held with Shawn but he agreed that the email to Shawn was sent on February 13, 2007. *Id.* at p. 196, *ll.* 19-22. However, despite Defendant's contention he had discussed and received approval for the e-magazine project with Shawn, Shawn testified he never authorized any expenditures related to the e-magazine project.[12] See N.T. Jury Trial Day 2, pp. 194-95. Moreover, Shawn testified he was never made aware money was expended towards the e-magazine project. *Id.* at p. 196, *ll.* 1-3. Furthermore, Shawn disputed the Defendant's testimony for while he acknowledged some preliminary discussion with the Defendant about "look[ing] into [the e-magazine project]", he stressed that he thought further discussion should take place before making any moves so as to ensure such a project made financial sense. *Id.* at p. 195, *ll.* 14-21. Thus, the jury heard that while the Defendant believed he was authorized to pursue the e-magazine project and that the minutes reflected this, they also heard testimony from Shawn, the one person Defendant alleged had authorized the

---

[12] The expenditure amounted to $29,000.00 and was paid to the Defendant via the National City account. Shawn testified not only did he not recall a conversation in which that was discussed, but also he never authorized such payments to the Defendant. See N.T. Jury Trial Day 2, p. 195, *ll.* 1-13, 22-25.

project and expenditure, who testified that he not only did not authorize such an expenditure, but had no idea the Defendant went ahead and expended the funds to do so. The jury heard the Defendant's version and Shawn's account. The jury apparently chose to believe Shawn's account rather than the Defendant, which is their prerogative as fact-finder. We see no error in this regard.

### vi. Alleged Error Six

In his final allegation of error, Defendant contends this court committed an error of law and abused our discretion by not granting a new trial as we allowed the introduction of evidence which Defendant alleges amounted to third-party hearsay testimony through the Commonwealth's rebuttal witness and acted to improperly bolster the credibility of Robert Eakin, one of the Commonwealth's witnesses. We do not agree. There was testimony that Rob was audited by the Internal Revenue Service ("IRS") regarding expense allegations concerning Century Propeller, a company owned primarily by Rob, although the Defendant also retained a small, minority stake. See N.T. Jury Trial Day 4, pp. 168-70; see also Commonwealth Exhibit L. The Commonwealth introduced a rebuttal witness, Henry Troese, a tax accountant, whose firm retained Rob and Century Propeller as clients. See N.T. Jury Trial Day 4, pp. 217-20. Mr. Troese testified simply that Rob was audited for years 2005 through 2009, regarding personal deposits made in 2009. *Id.* at pp. 223-24. The IRS apparently desired to see documentation as to where the deposits originated from. Mr. Troese testified that he served as Rob's accountant since 2008 and that he provided the required documentation to the IRS for years 2008 and 2009. *Id.* at p. 224, *ll.* 3-24. Mr. Troese further testified that so far as he knew the audit was concluded and no further action was taken. *Id.; see also* p. 225, *ll.* 18-24.

23

While defense counsel objected to Mr. Troese's testifying as hearsay, we fail to see how it can be construed as not competent hearsay. Mr. Troese testified solely to matters he participated in and had knowledge of—the submission of the required documentation for years 2008 and 2009—relative to an IRS audit inquiry that was satisfied upon receipt of the required documentation. We do not view it as hearsay when a witness testifies to a communication received from the IRS which brings about his submission of financial documentation in his role as an accountant to satisfy said query. Thus, we see no merit to this alleged error.

### *Conclusion*

In light of the foregoing analysis, the court would respectfully assert that the matter complained of on appeal is without merit, and that the appeal should be dismissed.

BY THE COURT,

H. WILLIAM WHITE, Senior Judge
Specially Presiding

cc:    Laurel Brandstetter, Esq. 412-565-5475
Robert Varsek, Esq. 814-677-5102
Clerk of Courts (P. Palmer)

WorkCentre 5225A
Transmission Report

Local Name
Logo

Document has been sent.
Document Size 8.5X11"SEF

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA        :
                                    :
v.                                  :        C.R. No. 115-2011
                                    :
STEVEN GREGORY EAKIN,               :
        Defendant                   :

OPINION OF COURT

AND NOW, this 25th day of June, 2013, the court has before it the Concise Statement of Errors Complained of on Appeal filed by the Defendant in the above captioned matter in accordance with Pa.R.A.P. 1925(b).[1] The court now issues the following opinion in support of its prior decision.

*Procedural History*

On December 16, 2011, Defendant was convicted by a jury after trial of one (1) count of Theft by Unlawful Taking, in violation of 18 Pa.C.S. § 3921(a), a Felony 3; one (1) count of Theft by Deception, in violation of 18 Pa.C.S. § 3922(a)(1), a Felony 3; one (1) count of Theft by Failure to Make Required Disposition of Funds Received, in violation of 18 Pa.C.S. § 3927(a), a Felony 3; and one (1) count of Misapplication of Entrusted Property, in violation of 18 Pa.C.S. § 4113, a Misdemeanor 2. Defendant was sentenced on February 7, 2012, to serve a prison term of six (6) months to twenty-four (24) months less one day concurrent with a probationary term of twenty-four (24) months. We imposed no sentence on the charges of Theft by Deception and Theft by Failure to Make Required Disposition of Funds as we found those charges merged with the charge of Theft by Unlawful Taking for sentencing purposes. On February 17, 2012,

[1] Defendant's pleading was actually titled "Concise Statement of Matters Complained of on Appeal," however the Court notes that the Pennsylvania Supreme Court by its Order dated May 10, 2007, changed the title of Pa.R.A.P. 1925 to "Concise Statement of Errors Complained of on Appeal". *In re Order Adopting Amendments to Pa.R.A.P. 1925* (May 10, 2007).

1

Total Pages Scanned: 24    Total Pages Sent    : 24

No.  Doc.       Remote Station        Start Time   Duration  Pages  Mode      Contents        Status

  1  8450  R VARSEK                   6-25; 1:08PM   4m07s   24/ 24  SG3                       CP

Note:
RE: Resend        MB: Send to Mailbox      BC: Broadcast      MP: Multi Polling     RV: Remote Service
PG: Polling       RB: Relay Broadcast      RS: Relay Send     BF: Box Fax Forward   CP: Completed
SA: Send Again    EN: Engaged              AS: Auto Send      TM: Terminated

WorkCentre 5225A

Transmission Report

G3 ID

Date/Time:06/25/2013;01:20PM
Page:1 (Last Page)

Local Name
Logo

Document has been sent.
Document Size 8.5X11"SEF

IN THE COURT OF COMMON PLEAS OF VENANGO COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA :
:
v. : C.R. No. 115-2011
:
STEVEN GREGORY EAKIN, :
Defendant :

## OPINION OF COURT

AND NOW, this 25th day of June, 2013, the court has before it the Concise Statement of Errors Complained of on Appeal filed by the Defendant in the above captioned matter in accordance with Pa.R.A.P. 1925(b).[1] The court now issues the following opinion in support of its prior decision.

*Procedural History*

On December 16, 2011, Defendant was convicted by a jury after trial of one (1) count of Theft by Unlawful Taking, in violation of 18 Pa.C.S. § 3921(a), a Felony 3; one (1) count of Theft by Deception, in violation of 18 Pa.C.S. § 3922(a)(1), a Felony 3; one (1) count of Theft by Failure to Make Required Disposition of Funds Received, in violation of 18 Pa.C.S. § 3927(a), a Felony 3; and one (1) count of Misapplication of Entrusted Property, in violation of 18 Pa.C.S. § 4113, a Misdemeanor 2. Defendant was sentenced on February 7, 2012, to serve a prison term of six (6) months to twenty-four (24) months less one day concurrent with a probationary term of twenty-four (24) months. We imposed no sentence on the charges of Theft by Deception and Theft by Failure to Make Required Disposition of Funds as we found those charges merged with the charge of Theft by Unlawful Taking for sentencing purposes. On February 17, 2012,

[1] Defendant's pleading was actually titled "Concise Statement of Matters Complained of on Appeal," however the Court notes that the Pennsylvania Supreme Court by its Order dated May 10, 2007, changed the title of Pa.R.A.P. 1925 to "Concise Statement of Errors Complained of on Appeal". *In re Order Adopting Amendments to Pa.R.A.P. 1925* (May 10, 2007).

1

Total Pages Scanned: 24    Total Pages Sent    : 24

| No. | Doc. | Remote Station | Start Time | Duration | Pages | Mode | Contents | Status |
|---|---|---|---|---|---|---|---|---|
| 1 | 8451 | 9-14125655475-60576 | 6-25; 1:12PM | 7m04s | 24/ 24 | SG3 | | CP |

Note:
RE: Resend         MB: Send to Mailbox      BC: Broadcast      MP: Multi Polling      RV: Remote Service
PG: Polling        RB: Relay Broadcast      RS: Relay Send     BF: Box Fax Forward    CP: Completed
SA: Send Again     EN: Engaged              AS: Auto Send      TM: Terminated